# United States Court of Appeals
## For the First Circuit

No. 24-1480

MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.,

Plaintiff, Appellee,

v.

EMILY MENASHES, Assistant Administrator, National Oceanic and
Atmospheric Administration, in her official capacity; NATIONAL
MARINE FISHERIES SERVICE; JEREMY PELTER, Secretary of the United
States Department of Commerce, in his official capacity,[*]

Defendants, Appellants,

CONSERVATION LAW FOUNDATION, INC.; DEFENDERS OF WILDLIFE; WHALE
AND DOLPHIN CONSERVATION SOCIETY,

Defendants.

No. 24-1481

MASSACHUSETTS LOBSTERMEN'S ASSOCIATION, INC.,

Plaintiff, Appellee,

v.

CONSERVATION LAW FOUNDATION, INC.; WHALE AND DOLPHIN
CONSERVATION SOCIETY; DEFENDERS OF WILDLIFE,

Defendants, Appellants,

NATIONAL MARINE FISHERIES SERVICE; JEREMY PELTER, Secretary of
the United States Department of Commerce, in his official

_____

[*] Pursuant to Federal Rule of Appellate Procedure 43(c)(2),
Emily Menashes has been substituted for Janet Coit as Acting
Assistant Administrator, and Jeremy Pelter has been substituted
for Gina M. Raimondo as Acting Secretary.

capacity; EMILY MENASHES, Assistant Administrator, National Oceanic and Atmospheric Administration, in her official capacity,

Defendants.

————————

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]

————————

Before

Gelpí, Kayatta, and Aframe,
Circuit Judges.

————————

Christopher Anderson, with whom Todd Kim, Assistant Attorney General, Environment and Natural Resources Division, U.S. Department of Justice, J. Brett Grosko, Taylor A. Mayhall, Andrew M. Bernie, and Sam Duggan, Attorney-Advisor, Office of General Counsel, National Oceanic and Atmospheric Administration, were on brief, for government appellants.

Andrea Joy Campbell, Attorney General for Massachusetts, Matthew Ireland, Assistant Attorney General, Energy and Environment Bureau, and James A. Sweeney, State Trial Counsel, for Massachusetts Division of Marine Fisheries, amicus curiae.

Jane P. Davenport, with whom Daniel M. Franz, Defenders of Wildlife, Erica A. Fuller, and Conservation Law Foundation were on brief, for conservation group appellants.

Daniel J. Cragg, with whom Samuel P. Blatchley, Robert T. Dube Jr., and Eckland & Blando LLP were on brief, for appellee.

————————

January 30, 2025

————————

AFRAME, Circuit Judge.   The principal issue in these appeals is whether Appellants National Marine Fisheries Service and two of its leaders (collectively, the "NMFS") acted lawfully in issuing a final rule seasonally banning from certain federal waters off Massachusetts the vertical buoy lines used in lobster and Jonah crab trap fishing.  See 89 Fed. Reg. 8333 (Feb. 7, 2024) (the "Final Rule").[1]  The ban runs from February 1 to April 30 each year.  Id. at 8334.  The NMFS issued the Final Rule to reduce the risk of injury or death to North Atlantic right whales, an endangered species that forages in the subject waters during these months and can become entangled in the buoy lines.

Appellee Massachusetts Lobstermen's Association, Inc. ("MALA") persuaded the district court that the Final Rule conflicts with a temporary statutory authorization for lobster and Jonah crab fishing contained in a rider to the Consolidated Appropriations Act of 2023 ("CAA").  See Pub. L. No. 117-328, Div. JJ, 126 Stat. 4459, 6089-93, § 101(a) (Dec. 29, 2022) [the "rider"].  But we conclude that the Final Rule is permitted by an

---

[1]  Additional Appellants include Conservation Law Foundation, Inc., Defenders of Wildlife, and the Whale and Dolphin Conservation Society (collectively, the "conservation groups").  The conservation groups appeared only as amici in the district court, but the court permitted them to intervene as defendants after entering final judgment "solely for the purpose of prosecuting an appeal." The NMFS and the conservation groups filed separate appeals, which we consolidated and now address together.

exception to that authorization contained in the same rider.  Id.
§ 101(b).  Accordingly, we reverse.

**I.**

Before reaching the issue of statutory interpretation
described above, we address our appellate jurisdiction.  MALA
contends that we must dismiss the NMFS's appeal because, although
U.S. Department of Justice attorneys filed a notice of appeal
within the applicable sixty-day period, see 28 U.S.C.
§ 2107(b)(2), (3), the U.S. Solicitor General ("SG") did not
authorize the appeal until after the sixty-day deadline had
expired.  MALA says that a Justice Department regulation requiring
that the SG "[d]etermin[e] whether, and to what extent, appeals
will be taken by the Government," see 28 C.F.R. § 0.20(b) (2025),
necessitates SG authorization within the sixty-day deadline.
Indeed, MALA goes further and says that the regulation must be
read to require the SG to control whether a notice of appeal is
filed at all.  Thus, the argument runs, the NMFS's otherwise-
timely notice of appeal was a legal nullity because it had not yet
been approved by the SG when filed and was not approved by the SG
within the sixty-day period.

We join the three courts of appeals that have rejected
variations of this argument.  See Rudisill v. McDonough, 55 F.4th
879, 884-86 (Fed. Cir. 2022) (en banc), rev'd on other grounds,
601 U.S. 294 (2024); United States v. Hill, 19 F.3d 984, 991 n.6

(5th Cir. 1994); <u>Hogg</u> v. <u>United States</u>, 428 F.2d 274, 277–81 (6th Cir. 1970). As those courts have explained, "nothing in 28 C.F.R. § 0.20(b) . . . requires the [SG] to have authorized the prosecution of an appeal before the filing of the notice of appeal." <u>Rudisill</u>, 55 F.4th at 886 (quoting <u>Hogg</u>, 428 F.2d at 280); <u>see also</u> <u>Hill</u>, 19 F.3d at 991 n.6 (adopting <u>Hogg</u>'s reasoning without further elaboration). Nor does the text of the regulation impose any timing requirements on the SG deciding "whether, and to what extent, appeals will be taken by the Government." 28 C.F.R. § 0.20(b) (2025).

Indeed, the Attorney General ("AG") has directed attorneys who are responsible for cases in trial courts to file "protective" notices of appeal, such as the one filed here, "to preserve the government's right to appeal" in circumstances where "the time for appeal or cross-appeal is about to expire" and the appropriate authorities have not yet decided whether to appeal.[2] Department of Justice, <u>Justice Manual</u> § 2-2.132, https://perma.cc/3AQU-LQ98. Thus, the AG, who is the source of

---

[2]    This provision refers to "the United States Attorney." At oral argument, MALA asserted that this language limits the provision to U.S. Attorneys (i.e., the officials who lead the ninety-four U.S. Attorneys' Offices). MALA did not, however, make this argument in its brief; the argument is thus waived. <u>See</u> <u>Seafreeze Shoreside, Inc.</u> v. <u>U.S. Dep't of the Int.</u>, 123 F.4th 1, 16 n.4 (1st Cir. 2024) ("[P]arties must include within the four corners of their briefs any arguments they wish the court to consider . . . ." (citation omitted)).

§ 0.20, does not understand it to impose upon the SG the atextual limitations that MALA suggests.

MALA premises its contrary argument on a formalistic assertion that the determination of "whether an appeal will be taken" cannot be separated from deciding to file a notice of appeal. MALA elaborates: "The filing of a notice of appeal is a necessary and triggering component of an appeal, and not a 'separate act' from the determination of whether the government may bring an appeal." But this description defies reality. The filing of a notice of appeal is a procedural step that both invokes an appeals court's jurisdiction and preserves a party's right to seek appellate review of an adverse judgment. It does not, however, obligate the filing party to pursue the appeal to judgment (or even to briefing), see Fed. R. App. P. 42 (providing for the dismissal of appeals in various scenarios), or otherwise constitute "the appeal" for purposes of § 0.20.[3]

The timely notice of appeal filed in this case was thus sufficient to establish our appellate jurisdiction. We therefore turn to the merits.

---

[3]    MALA also argues that FEC v. NRA Political Victory Fund, in which the Supreme Court held that the Federal Election Commission lacks statutory authority to unilaterally file a petition for a writ of certiorari, requires a contrary outcome. See 513 U.S. 88, 98 (1994). But Rudisill rejected this argument, and we agree with Rudisill that the facts of NRA are sufficiently distinguishable from those present here. See 55 F.4th at 885.

## II.

## A.

The federal government designated the right whale as endangered in 1970, 35 Fed. Reg. 18,319, 18,320 (Dec. 2, 1970), and, since 1972, it has been protected by the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. ch. 31, which was enacted that year. The MMPA makes it unlawful to "take" right whales in U.S. waters or on the high seas except as authorized by treaty or statute. Id. § 1372(a). "The term 'take' means to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." Id. § 1362(13).

Section 118 of the MMPA authorizes the "incidental taking" of marine mammals during commercial fishing operations conducted in accord with the requirements of that section. Id. § 1387(a). The principal statutory mechanism for authorizing such an incidental taking while meeting the MMPA's conservation goals is the "take reduction plan," which is "designed to assist in the recovery or prevent the depletion of" statutorily protected species that interact with commercial fisheries. Id. § 1387(f)(1). A take reduction plan seeks "to reduce, within 6 months of its implementation, the incidental mortality or serious injury of marine mammals incidentally taken in the course of commercial fishing operations to levels less than the potential biological removal level established for that stock." Id.

§ 1387(f)(2).  The "potential biological removal level" is "the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population."  Id. § 1362(20).

Take reduction plans, and amendments to such plans, are developed by the NMFS, as the Secretary of Commerce's designee, in consultation with "take reduction teams" comprising individuals with relevant scientific expertise concerning the marine mammals in question or the operation of commercial fisheries.  See id. § 1387(f)(6)(C).  The NMFS first promulgated a take reduction plan for the right whale in 1997.  See 62 Fed. Reg. 39,157 (July 22, 1997).  The plan has since been modified several times.

Section 118 of the MMPA also provides the NMFS with emergency rulemaking authority.  16 U.S.C. § 1387(g)(1)(A)(i). The statute states that the NMFS "shall . . . prescribe emergency regulations" for species with an established take reduction plan "[i]f the [NMFS] finds that the incidental mortality and serious injury of marine mammals from commercial fisheries is having, or is likely to have, an immediate and significant adverse impact on a stock or species."  Id. § 1387(g)(1).  Such emergency rules "shall remain in effect for not more than 180 days or until the end of the applicable commercial fishing season, whichever is earlier."  Id. § 1387(g)(3)(B).  And, if the NMFS finds that

mortality or significant injury from a commercial fishery "is continuing to have an immediate and significant adverse impact on a stock or species," it may extend the rule "for an additional period of not more than 90 days or until reasons for the emergency no longer exist, whichever is earlier." Id. § 1387(g)(4). Also, if circumstances so warrant, the NMFS "shall" address the adverse impact giving rise to the emergency rule by "approv[ing] and implement[ing], on an expedited basis, any amendments to [a take reduction] plan that are recommended by the take reduction team to address such adverse impact." Id. § 1387(g)(1)(A)(ii).

The right whale remains highly endangered, and its population is declining. A 2022 study estimates that there are approximately 356 remaining right whales, of which fewer than 100 are breeding females. According to the NMFS, the steep decline results from, inter alia, human-caused mortality from entanglements in fishing gear and vessel strikes in both U.S. and Canadian waters.

In late 2017, the NMFS began to address the right whale population decline by informing the take reduction team that it was necessary to amend the plan. Following study and consultation with the team, in 2021, the NMFS imposed new rules on the lobster and Jonah crab fisheries to reduce entanglement risks to right whales. 86 Fed. Reg. 51,970 (Sept. 17, 2021) [the "2021 Take Reduction Plan Amendment"]. The 2021 Take Reduction Plan

Amendment, inter alia, expanded the boundaries of an area of federal waters, known as the "Massachusetts Restricted Area," which is seasonally closed to vertical buoy lines each year from February 1 to April 30. Id. at 52,019–20. At about the same time, amicus Massachusetts Division of Marine Fisheries independently expanded north to the New Hampshire border an area of state waters covered by a similar seasonal closure. See 322 Mass. Code Regs. 12.00 (2025).

In early 2022, the Massachusetts Division of Marine Fisheries alerted the NMFS that these two adjustments to the geographic scope of the seasonally closed federal and state waters had inadvertently left unprotected an approximately 200-nautical-mile area of federal waters that, because of its shape, is known as "the Wedge." The Wedge is part of the corridor through which right whales enter and exit Cape Cod Bay during their spring migration. Surveys confirmed that lobstermen were making increased use of the Wedge during the spring closure period and that right whales were present in the Wedge in significant numbers during that time. While some lobstermen fished in the Wedge during this period, more used it to "wet store" their gear, including their vertical buoy lines, so that these lines would be ready for quick deployment when the surrounding waters opened for lobster fishing on May 1.

The NMFS determined that the significant presence of right whales in the Wedge during the spring closure period, combined with the high density of vertical buoy lines observed in the Wedge, substantially increased the risk of entanglements. Therefore, on March 2, 2022, the NMFS issued an emergency rule closing the Wedge to vertical buoy lines for the remainder of that spring season (through April 30, 2022). 87 Fed. Reg. 11,590 (Mar. 2, 2022) (relying on § 1387(g)(1), (3)) [the "2022 emergency rule"]. The NMFS tells us, without contradiction from MALA, that this was the first emergency rule affecting the lobster and Jonah crab fisheries that was issued under the MMPA or the Endangered Species Act ("ESA"), 16 U.S.C. ch. 35, in more than a decade, and the only such rule issued in 2022.

Meanwhile, interested parties had filed two separate lawsuits in the U.S. District Court for the District of Columbia challenging the 2021 Take Reduction Plan Amendment from different directions. In the first suit, conservation groups alleged, inter alia, that the Amendment was inadequate under the MMPA because it would not reduce right whale mortality and serious injuries below the potential biological removal level within six months. See id. § 1387(f)(2). The district court granted the conservation groups summary judgment on that issue; remanded without vacatur; and ordered the NMFS to finalize a new, statutorily compliant rule by December 9, 2024. Ctr. for Biological Diversity v. Raimondo,

No. 18-cv-00012, 2022 WL 17039193, at *3 (D.D.C. Nov. 17, 2022), <u>vacated as moot on other grounds</u>, 2024 WL 324103 (D.D.C. Jan. 29, 2024) ["<u>CBD</u>"].

The second suit was filed by the State of Maine and lobster industry associations, including MALA. These plaintiffs alleged, inter alia, that the 2021 Take Reduction Plan Amendment was arbitrary and capricious because the NMFS had overestimated the impact of the lobster fishery on right whales by relying on inappropriate assumptions. The district court upheld the Amendment against that challenge. <u>Me. Lobstermen's Ass'n</u> v. <u>NMFS</u>, 626 F. Supp. 3d 46, 61, 69 (D.D.C. 2022). But the D.C. Circuit reversed, holding that a biological opinion informing the NMFS's analysis, which relied on worst-case scenarios, was inconsistent with the ESA's requirements. <u>See</u> 70 F.4th 582, 600 (D.C. Cir. 2023). The D.C. Circuit remanded to the district court without vacating the rule, observing that it was "not convinced the error claimed by the lobstermen is fatal to the rule." <u>Id.</u>

Following the <u>CBD</u> remand order, and while the <u>Maine Lobstermen's</u> appeal was pending, the NMFS reconvened the take reduction team so that it could recommend additional measures to comply with the timetable specified in the <u>CBD</u> remand. The team made some recommendations but, before the NMFS could propose new take reduction plan amendments, Congress intervened with the rider, the meaning of which we consider in these appeals.

**B.**

The rider contains three parts.  The first part of the rider is found in title I, section 101, and sets forth both a temporary authorization for lobster and Jonah crab fishing, section 101(a), and an exception to that authorization, section 101(b):

> (a) IN GENERAL. -- Notwithstanding any other provision of law except as provided in subsection (b), for the period beginning on the date of enactment of this Act and ending on December 31, 2028, the [2021 Take Reduction Plan Amendment] shall be deemed sufficient to ensure that the continued Federal and State authorizations of the American lobster and Jonah crab fisheries are in full compliance with the [MMPA and ESA]. . . .

> (b) EXCEPTION. -- The provisions of subsection (a) shall not apply to an existing emergency rule, or any action taken to extend or make final an emergency rule that is in place on the date of enactment of this Act, affecting lobster and Jonah crab.

The second part is found in title II, sections 201–203, which create a grant program to support "research to identify, deploy, or test innovative gear technologies," subsidize their acquisition by fisheries participants, and authorize appropriations of up to $50 million annually between 2023 and 2032. The final part is found in title III, section 301, which directs the NMFS to conduct a plankton survey and to prioritize the collection of plankton samples and data that "inform the conservation of North Atlantic right whales."

The rider's effective date was December 29, 2022.  About a month later, the NMFS announced that it would be extending the 2022 emergency rule to close the Wedge to vertical buoy lines from February 1, 2023, through April 30, 2023.  88 Fed. Reg. 7362 (Feb. 3, 2023) (relying on § 1687(g)(4)) [the "2023 extension"]. In issuing the 2023 extension, the NMFS stated that, notwithstanding any impediment that otherwise might be posed by the authorizations in section 101(a) of the rider, the 2023 extension was "permitted pursuant to [the] exception at [section] 101(b)" because the 2022 emergency rule was "in place" on December 29, 2022, the date of the rider's enactment.

On February 1, 2023, MALA filed a lawsuit in the U.S. District Court for the District of Columbia seeking to enjoin the 2023 extension on the ground that it violated section 101(a). Mass. Lobstermen's Ass'n v. NMFS, No. 23-cv-00293, 2023 WL 3231450, at *2 (D.D.C. May 3, 2023).  The district court denied provisional relief.  Id.  Subsequently, after the Wedge reopened to vertical buoy lines on May 1, 2023, the NMFS successfully moved to dismiss the case as moot.  Id. at *1.

In September 2023, the NMFS proposed finalizing the 2022 emergency rule.  88 Fed. Reg. 63,917 (Sept. 18, 2023).  After receiving and responding to public comments, in February 2024, the NMFS issued the Final Rule amending the 2021 Take Reduction Plan to incorporate the Wedge into the Massachusetts Restricted Area.

89 Fed. Reg. 8333 (Feb. 7, 2024).  The Final Rule thus closes the Wedge to vertical buoy lines from February 1 through April 30 on an annual basis.  Id.

On February 9, 2024, MALA sued the NMFS in the U.S. District Court for the District of Massachusetts under the MMPA and CAA, among other laws.  The complaint contained seven counts. Count one alleged that the Final Rule (1) conflicts with the temporary authorizations of the American lobster and Jonah crab fisheries contained in section 101(a) of the rider, and (2) does not fall within section 101(b)'s exception to that provision. Count two alleged that the scope of the Wedge closure worked by the Final Rule is unlawfully expansive.  The remaining counts presented different theories, not relevant here, for why the court should invalidate the Final Rule.  MALA also moved for a temporary restraining order, preliminary injunction, and administrative stay with respect to counts one, two, and three.

On March 7, 2024, the district court held a hearing on MALA's motion.  At that hearing, the court expressed its intention to address only the purely legal issues raised in counts one and two, on which it would consolidate MALA's motion with a trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). In doing so, the court explained that, if it were to agree that the Final Rule conflicts with section 101(a) and does not fall within section 101(b)'s exception, the case could be decided

without any need for resolution of the additional claims set forth in the remaining counts.  The parties acquiesced in this plan.

One week later, on March 14, 2024, the district court held a trial on the purely legal issues raised in counts one and two, at the conclusion of which it ruled in MALA's favor on count one and declined to address count two.  The next day, the court entered a final declaratory judgment holding the Final Rule "void and unenforceable" under the rider and effectively dismissed the remaining counts of the complaint.  On April 16, 2024, the court issued a memorandum of decision containing findings of fact and rulings of law that explained its judgment.  Mass. Lobstermen's Ass'n v. NMFS, No. 24-cv-10332, 2024 WL 2194260 (D. Mass. Apr. 16, 2024).

Our principal concern is with the portion of the district court's analysis that addressed the impact of the rider on the Final Rule.[4]  The court started from the premise that, per the

---

[4]    Although this lawsuit ultimately involves only the legality of the Final Rule, the district court also opined that the 2023 extension of the 2022 emergency rule was unlawful.  Mass. Lobstermen's Ass'n, 2024 WL 2194260, at *5.  The court provided two reasons for this conclusion: first, that § 1387(g)(3)(B), which provides that emergency MMPA regulations "remain in effect . . . [only] until the end of the applicable commercial fishing season," precludes treating the 2023 extension as an "extension" of the 2022 emergency rule, given the temporal gap between the two; and second, that the NMFS's contrary interpretation of the MMPA was inconsistent with a litigation position the NMFS took seventeen years ago concerning the Magnuson-Stevens Fishery Conservation and Management Act.  See id. at *5 & n.9 (citing Starbound, LLC v. Gutierrez, No. 07-cv-00910, 2008 WL 1752219, *4

combined operation of sections 101(a) and (b) of the rider, the NMFS is prohibited through December 31, 2028, from issuing any new regulation under the MMPA or ESA "affecting lobster and Jonah crab" fishing authorizations unless the regulation is, inter alia, "an[] action taken to . . . make final an emergency rule that [was] in place on the date of the [rider's] enactment," i.e., December 29, 2022.[5] Id. at *2.

_____

(W.D. Wash. Apr. 15, 2008) (noting the NMFS's argument that a challenge to a regulation imposed for the 2007 fishing season became moot once that season closed)).

We disagree with the district court's conclusion that the 2023 extension was unlawful. The court's reasoning proceeded from an erroneous premise: that the Wedge closure worked by the 2022 emergency rule was a regulatory limitation imposed for the duration of a "commercial fishing season." Mass. Lobstermen's Ass'n, 2024 WL 2194260 at *5 n.9. It was not. Moreover, and more generally, there need not be unbroken temporal continuity between a period in which a regulatory prohibition is in place and a lawful "extension" of that prohibition. See HollyFrontier Cheyenne Refining, LLC v. Renewable Fuels Ass'n, 594 U.S. 382, 388–96 (2021) (holding that, in certain contexts, a regulatory exemption can be "extended" notwithstanding a lack of temporal continuity between the initial exemption and its extension). Here, where the same emergency prompted the 2022 emergency rule and 2023 extension, and where the temporal gap between the closures was tied to the absence of right whales in the Wedge outside of the February–April foraging season, the NMFS sensibly regarded the 2023 extension as an MMPA-compliant extension of the 2022 emergency rule.

[5]    The conservation groups argue that section 101(a) does not in fact impose a temporary ban on regulations affecting the lobster and Jonah crab fisheries. We do not reach this argument, which the NMFS does not join, because, as explained infra, we conclude that the Final Rule falls within section 101(b)'s exception even if it were otherwise barred by section 101(a).

The district court then considered and rejected the NMFS's argument that its adoption of the Final Rule pursuant to § 1387(g)(1)(A)(ii) was permissible under section 101(b) because it was, in substance, an action to make final the 2022 emergency rule, which was "in place" on the rider's date of enactment. Id. at *6. In the court's view, the statutory phrase "in place" is synonymous with "in effect." See id. And the 2022 emergency rule, which closed the Wedge to vertical buoy lines only from April 1 to April 30, 2022, was no longer "in effect" on December 29, 2022, because on that date, the regulation was not preventing lobster or Jonah crab fishing in the Wedge. See id. The Final Rule was thus, in the court's view, barred by section 101(a) and did not fall within section 101(b)'s exception.[6] See id. at *7.

These appeals followed.

---

[6] The district court also suggested, in the alternative, that the NMFS should be estopped from arguing that the 2022 emergency rule was "in place" on December 29, 2022. See Mass. Lobstermen's Ass'n, 2024 WL 2194260, at *6. The court viewed this argument as inconsistent with the NMFS's assertion before the D.C. District Court that MALA's challenge to the 2023 extension became moot once the Wedge reopened for lobster fishing on May 1, 2023. See id. We see no inconsistency. In both cases, the NMFS maintained that § 1387(g)(4) allowed for only a single extension of the 2022 emergency rule, whereas § 1387(g)(1)(A)(ii) must serve as the basis for any further regulatory action necessitated by the persistence of the emergency beyond the expiration of an extension. In other words, the NMFS continues to stand by the foundation of its mootness argument, which is that § 1387(g)(4) could no longer serve as a source of authority for further regulatory extensions of the 2022 emergency rule once the single extension permitted by the statute had expired in 2023.

**III.**

The NMFS and conservation groups argue that the district court erred in concluding that, for purposes of section 101(b) of the rider, the 2022 emergency rule was not "in place" on December 29, 2022 -- when the rider became law.  They assert that a better reading of the statute's text, as informed by context and the consequences of a contrary reading, should yield a conclusion that the 2022 emergency rule was "in place" on that date.  We consider this argument de novo and agree.  See Mundell v. Acadia Hosp. Corp., 92 F.4th 1, 5-6 (1st Cir. 2024) ("The interpretation of a statute . . . , which presents a purely legal question, is . . . subject to de novo review.").

We begin by observing that these appeals do not ask us to interpret a broadly applicable statute designed to address future controversies involving unknown parties and facts.  Rather, as clearly implied by the statute's facially targeted text and its consistent history, Congress enacted the rider to address the specific, ongoing series of disputes among the parties to these appeals, and others similarly situated, about how to balance the interests of the American lobster and Jonah crab fisheries with those of the endangered right whale following the D.C. District Court's decision in CBD.  See 168 Cong. Rec. S9591, 9607-08 (daily ed. Dec. 20, 2022) (statement of Sen. Angus King) (describing the statutory rider as a "compromise" designed to "pause the economic

death sentence" to the lobster industry that would be occasioned by implementation of the regulatory actions required by CBD).  It is against this backdrop that we decide whether the 2022 emergency rule was "in place" on December 29, 2022.

MALA contends, and the district court held, that the statutory term "in place" is synonymous with the colloquial phrase "in effect," and that it therefore cannot be understood as anything other than a requirement that an emergency Wedge closure be in place (or in effect) on December 29, 2022, for the exception described in section 101(b) to apply.  Mass. Lobstermen's Ass'n, 2024 WL 2194260, at *6.  In other words, the district court interpreted "in place" to impose a requirement that, on December 29, 2022, the 2022 emergency rule be actively preventing lobster and crab fishermen from operating in the Wedge.  See id.  We assume for the sake of argument that "in place" means "in effect," at least for purposes of section 101(b).  But even so, we disagree with MALA's position and the court's conclusion because this term does not require the 2022 emergency rule to have been preventing fishing in the Wedge on the operative date.

As a textual matter, the section 101(b) exception does not require that an actual Wedge closure occasioned by an emergency rule be "in place" on the enactment date; it requires only that an "existing emergency rule" be in place.  The operative question then is, "in place" for what purpose?  Enforcement of the Wedge's

2022 seasonal closure was not the only regulatory action for which the 2022 emergency regulation could serve as a predicate. Under §§ 1387(g)(1)(A)(ii), (g)(4), and as explicitly contemplated in section 101(b), the findings underlying the issuance of an emergency rule also can inform the extension and finalization of such a rule.

And here, they did so. The same threat to the right whale described in the 2022 emergency rule findings persisted beyond the 2022 foraging season and therefore, per the MMPA, required additional regulatory actions: (1) the closure of the Wedge to lobster/Jonah crab fishing and fishing gear during the spring 2023 foraging season, which the NMFS accomplished through an extension of the 2022 emergency rule under § 1687(g)(4); and (2) an eventual permanent closure of the Wedge to lobster/Jonah crab fishing and fishing gear during the annual February–April foraging season, which the NMFS accomplished under § 1687(g)(1)(A)(ii).

The fact that, on December 29, 2022, an aspect of the 2022 emergency rule still could serve as a source of authority for these future regulatory actions means that the rule was not a dead letter on that date. This was not akin to a situation where a law, although not formally repealed, has lost its authority, is entirely ineffectual, or is defunct. There are myriad situations where a duly enacted law, although not presently restricting

conduct, authorizes future regulatory action.[7]  We think it appropriate to describe such a law as being "in place" (or, again, "in effect").  It therefore does no violence to section 101(b)'s text to regard the 2022 emergency rule as being "in place" on December 29, 2022.

We find support for concluding that the 2022 emergency rule was in place on December 29, 2022, in the consequences of reaching a contrary conclusion.  As previously noted, the 2022 emergency rule was the first emergency rule affecting the lobster and Jonah crab fisheries that was issued under the MMPA or the ESA in more than a decade, and the only such rule issued in 2022.  It is therefore likely, as we read the record, that the drafters of section 101(b) had the 2022 emergency rule in mind when writing that the restrictions imposed by section 101(a) "[did] not apply to an existing emergency rule, or any action taken to extend or make final an emergency rule that is in place on [December 29, 2022] affecting lobster and Jonah crab."  Moreover, if the 2022 emergency rule is not regarded as having been "in place" on December 29, 2022, no other rule could possibly have come within the exception specified in section 101(b), rendering it a nullity

---

[7]     Think, for example, of a duly enacted amendment to a tax law that authorizes future enforcement after some identified date. Or consider a duly enacted law whose regulatory effects are only triggered by a presidential declaration.  See, e.g., National Emergencies Act, 50 U.S.C. ch. 34.

ab initio.[8]  Courts are to avoid interpretations of statutes that
have this effect, see Nielsen v. Preap, 586 U.S. 392, 414 (2019),
especially when doing so renders entire statutory subsections
inoperative, see Pulsifer v. United States, 601 U.S. 124, 143
(2024).[9]

## IV.

For the reasons stated, we have jurisdiction to
entertain the NMFS's appeal and conclude that the Final Rule was
lawful, and may be enforced, under the exception contained in
section 101(b) of the rider.  Accordingly, we **reverse** the judgment
of the district court and **remand** for further proceedings consistent
with this opinion.

**So ordered.**

---

[8]  MALA speculates that the drafters might have had in mind
the possibility of a new emergency rule promulgated after Congress
passed the statutory rider but before its "enactment," which
occurred upon the President's signature less than a week later.
We regard this theory as implausible.  The record contains no
evidence that any new emergency rules affecting the lobster or
Jonah crab fisheries were under consideration at the time Congress
passed the rider.

[9]  MALA contends that, by accepting the NMFS's reading of
section 101(b), we are in substance deferring to an agency
interpretation of an ambiguous statute in violation of Loper Bright
Enterprises v. Raimondo, 603 U.S. 369, 412–13 (2024).  Not so.
Our holding that the 2022 emergency rule was "in place" for
purposes of section 101(b) is based upon our own de novo reading
of the statutory rider and involves no deference to the NMFS's
construction.